**UNITED STATES of America, Plaintiff,**

v.

**ONE DLO MODEL A/C, 30.06 MACHINE GUN, SERIAL NUMBER 86–70056, et. al., Defendants.**

No. 5:93 CV 2306.

United States District Court,
N.D. Ohio,
Eastern Division.

Aug. 1, 1995.

Lynne H. Buck, James L. Morford, Office Of The U.S. Attorney, Cleveland, OH, for plaintiff.

Craig A. Marvinney, Reminger & Reminger, Cleveland, OH, pro se.

Timothy A. Shimko, Sr., Shimko & Associates, Cleveland, OH, James H. Jeffries, III, Greensboro, NC, for claimant.

*MEMORANDUM OPINION*

DOWD, District Judge.

## I. Introduction

The Court has before it the motion of Plaintiff, the United States of America, (Docket No. 18) for issuance of a certificate of reasonable cause in connection with its failed seizure of 32 firearms from the residence of the successful claimant Louis E. Katona, III ("Mr. Katona"), and the competing motion of the claimant for an award of attorney fees and costs (Docket No. 36). A review of the procedural setting surrounding these competing motions is appropriate.

Three cases arose from the seizure of 32 firearms from the home of Louis E. Katona on May 8, 1992. On March 24, 1993, Mr. Katona filed a federal civil rights action, Case No. 5:93 CV 0638 ("civil action"), against Joseph Beran, the Chief of Police of the City of Bucyrus, Ohio, and three special agents of the Bureau of Alcohol, Tobacco, and Firearms ("BATF"), Lance Kimmell, Stephen St. Pierre and Stephen Wells. The three special agents sought the search warrant which they later used to seize the firearms (Claimant's Mot. to Hold in Abeyance and Memo. in Support, Docket No. 8, October 25, 1993, Affidavit of Mr. Katona, ¶ 15). This civil action is currently pending before this Court.

On September 14, 1993, almost six months after Mr. Katona initiated his civil action, he was indicted by a federal grand jury for having submitted forged signatures of Chief Beran in support of his applications to transfer ownership of the 32 seized firearms (Compl. ¶ 7), (Case No. 5:93 CR 0275, N.D.Ohio). Then, on October 28, 1993, the government initiated this forfeiture action as to the 32 seized firearms.

The criminal prosecution ended in Mr. Katona's favor on April 25, 1994, when Judge George White directed a verdict for Mr. Katona (Claimant's Mot. for Summary Judgment, Docket No. 15, Transcript of April 25, 1994, proceedings before Judge White). Subsequently, on June 3, 1994, the government moved to dismiss the forfeiture action (Docket No. 19) and contemporaneously moved for the issuance of a certificate of reasonable cause as to the seizure of the firearms pursuant to 28 U.S.C. § 2465 (Docket No. 18). This Court granted the motion to dismiss (Docket No. 33), but deferred a ruling on the motion for the issuance of a certificate of reasonable cause so as to consider it in relation to the claimant's motion for an award of attorney fees. When the Court granted the government's motion to dismiss the forfeiture action, it called for the return of the firearms (Docket No. 33); but delayed any ruling on the issues of fees and the issuance of a certificate of reasonable cause until Mr. Katona had the opportunity to depose the three BATF agents (Docket No. 32), and until the Court had given the parties the opportunity to supplement their respective positions on attorney fees and the certificate. Having received those responses, the Court now rules on the motions before it.

## II. Background Facts

Louis E. Katona is a 34-year old resident of Bucyrus, Crawford County, Ohio (Oct. 25, 1993, Katona Aff., ¶ 1). He is married and he and his wife have two children (Oct. 25, 1993, Katona Aff., ¶ 2). Mr. Katona has no criminal record and had never been arrested or charged with any crime until the present indictment (Oct. 25, 1993, Katona Aff., ¶ 4). Mr. Katona is a licensed Realtor and an NRA-certified firearms instructor (Oct. 25, 1993, Katona Aff., ¶ 3). Mr. Katona served as a firearms instructor and an auxiliary member of the Bucyrus Police Department from April 1983 until September 14, 1988 (Oct. 25, 1993, Katona Aff., ¶ 3, ¶ 7). On May 9, 1988, Mr. Katona graduated from the Ohio Peace Officer Basic Training Program conducted by the Office of the Attorney General of Ohio, and has worked as a part-time officer of the New Washington, Ohio, Police Department since March 10, 1989 (Oct. 25, 1993, Katona Aff., ¶ 3).

Mr. Katona has had a lifelong interest in firearms and has been a competitive shooter, hunter and collector since he was young (Oct. 25, 1993, Katona Aff., ¶ 5). After he turned 21, Mr. Katona began to collect National Firearms Act firearms ("NFA firearms") (Oct. 25, 1993, Katona Aff., ¶ 5). NFA firearms are weapons such as machine guns, silencers, grenade launchers, land mines and

tanks, which fall under the National Firearms Act ("NFA"), and are defined under Title 26 U.S.C. § 5845 (Plaintiff Attachs. to Memo. in Support of Mot. to Dismiss and/or for Summary Judgment, Docket No. 56, Transcript of proceedings before Judge George W. White, Case No. 5:93 CR 0275 ("Ct.Tr."), 73; Plaintiff Response to Claimant's Mot. for Summary Judgment, Docket No. 17, May 1992 Kimmell Aff., 1). Between 1982 and 1991, Mr. Katona acquired or made, and in a few instances sold, approximately 50 NFA firearms (Oct., 25, 1993, Katona Aff., ¶ 5). Mr. Katona contends that every NFA firearm that he has ever possessed was by a tax-paid transfer (Oct. 25, 1993, Katona Aff., ¶ 5). Mr. Katona's collection of NFA firearms has been appraised at more than $100,-000 (Compl. ¶ 5). Mr. Katona states that he has used some of his NFA firearms to teach firearms safety and marksmanship to officers of the Bucyrus Police Department and to personnel of the Ohio Military Reserve (Oct. 25, 1993, Katona Aff., ¶ 5).

The BATF requires that in order to lawfully register NFA weapons defined under Title 26 U.S.C. § 5845, the applicant ("transferee") must complete and forward an application form to the BATF for approval prior to the transfer (May 1992 Kimmell Aff., 1). If the transferee is not a Federal firearms licensee (an authorized manufacturer of NFA firearms), then the transferee must obtain the approval and signature on the application form of a chief law enforcement officer having jurisdiction in the area of residence of the transferee (May 1992 Kimmell Aff., 1).[1] This form states that "the transferee must sign the Applicant Certification ... in the presence of the law enforcement officer signing ... below" (Ct.Tr., Exs.). By his signature, the chief law enforcement officer declares that he has "no information indicating that the transferee will use the firearm or device described on this application for other than lawful purposes" (Ct.Tr., Exs.)

Mr. Katona testified that between 1982 and September of 1986, he acquired at least ten NFA firearms (Oct. 25, 1993, Katona Aff., ¶ 6). When Mr. Katona bought his first NFA firearm in 1982, Sheriff Ron J. Shawber, Sheriff of Crawford County, Ohio, signed the application form for him (Oct. 25, 1993, Katona Aff., ¶ 6; Ct.Tr., 52). After Mr. Katona became an auxiliary policeman on the Bucyrus Police Department in April of 1982, he submitted his BATF forms to the Chief of Police for whom he was working (Oct. 25, 1993, Katona Aff., ¶ 6). At first this was Chief Charles D. McDonald, and from 1986 onward it was Chief Joseph Beran (Oct. 25, 1993, Katona Aff., ¶ 6). At the criminal trial before Judge White, Case No. 5:93 CR 275, Chief Beran testified that prior to Mr. Katona's resignation from the Bucyrus police force in September of 1988, Chief Beran signed between six and eight forms for Mr. Katona (Ct.Tr., 97).

At the end of the summer of 1988, Mr. Katona and Chief Beran had a disagreement that eventually led to Mr. Katona's resignation from the Bucyrus auxiliary police force in September of 1988. At the end of July or the beginning of August of 1988, Mr. Katona's father, Louis E. Katona Jr. ("Mr. Katona Jr."), attended a gun show in Mansfield, Ohio, where he bought for Louis Katona an antique gold-plated badge inscribed "Chief—Bucyrus Police" (Oct. 25, 1993, Katona Aff., ¶ 7). Mr. Katona learned that it had belonged to the first police chief of Bucyrus (Oct. 25, 1993, Katona Aff., ¶ 7). When Chief Beran saw the badge, he said that "it would make a good wallet badge" (Ct.Tr., 208–209; Oct. 25, 1993, Katona Aff., ¶ 7). Mr. Katona offered to make a historical display of the badge with the photograph of the first chief and present it to the city of Bucyrus (Oct. 25, 1993, Katona Aff., ¶ 7). Chief Beran subse-

---

1. The form explains that the "chief law enforcement officer is considered to be the Chief of Police for the transferee's city or town of residence, the Sheriff of the transferee's county of residence; the Head of the State Police for the transferee's State of residence; a State or local district attorney or prosecutor having jurisdiction in the transferee's area of residence; or another person whose certification is acceptable to the Director, Bureau of Alcohol, Tobacco and Firearms. If someone has specific delegated authority to sign on behalf of the Chief of Police, Sheriff, etc., this fact must be noted by printing the Chief's, Sheriff's, or other authorized official's name and title, followed by the word 'by' and the full signature and title of the delegated person" (Docket No. 56, Ct.Tr., Ex.).

quently stated that he had discovered that the badge had been reported stolen and that Mr. Katona should return it to the family (Ct.Tr., 207–208; Oct. 25, 1993, Katona Aff., ¶ 7). Mr. Katona testified that he believed that Chief Beran wanted the badge for himself, and that the tension between himself and the Chief over the matter became so bad that Mr. Katona decided to resign as an auxiliary policeman on September 14, 1988 (Oct. 25, 1993, Katona Aff., ¶ 7).

Several years later, in March of 1991, Sheriff Ron Shawber called the BATF and spoke to Agent Tom Scoufis (Ct.Tr., 53–54). Sheriff Shawber testified that he called because he discovered that there was an automatic weapon and possibly a silencer in Crawford County and was concerned about who signed the NFA transfer forms for the weapons (Ct.Tr., 54–55). Sheriff Shawber explained that sometime prior to 1984, he and the other chiefs within Crawford County (which includes the city of Bucyrus) had agreed that they would not sign any more of the forms, so he wondered if someone without authority had signed the forms for the two weapons that had appeared (Ct.Tr., 55). Agent Scoufis testified that Sheriff Shawber also expressed his general concern involving the X–Ring Custom Shop, a store owned by Louis E. Katona Jr., who at the time was a federally-licensed firearms dealer (Ct.Tr., 70–71; Plaintiff Ex.Index, Docket No. 57, March 14, 1994, Declaration of Louis E. Katona Jr., ¶ 3). Apparently, Agent Scoufis did not investigate these concerns until February of 1992, eleven months later (Ct.Tr., 72–73).

In April of 1991, Special Agent Lance Kimmell of the Cleveland office of BATF contacted Mr. Katona to inspect a grenade launcher Mr. Katona had purchased (Oct. 25, 1993, Katona Aff., ¶ 8; May 1992 Kimmell Aff., 5). On April 26, 1991, Agent Kimmell went to Bucyrus, inspected the grenade launcher and announced that he was going to use it as evidence in an ongoing prosecution in Oklahoma, *United States v. William Fleming,* Criminal No. 91–CR–168–E (N.D.Okla.), which did not involve or implicate Mr. Katona (Oct. 25, 1993, Katona Aff., ¶ 8). Mr. Katona voluntarily turned over the grenade launcher to Agent Kimmell, and Agent Kim-

mell gave him a receipt (Oct. 25, 1993, Katona Aff., ¶ 8). Agent Kimmell told Mr. Katona that the grenade launcher would be returned to him following the conclusion of the Oklahoma criminal proceedings (Docket No. 17, May 31, 1994, Affidavit of Agent Kimmell, ¶ 3a).

On February 18, 1992, Agent Scoufis appeared at Mr. Katona Jr.'s firearm shop, the X–Ring Custom Shop, to follow up on Sheriff Shawber's phone call of March 1991 (March 14, 1994, Katona Jr. Declaration, ¶ 14). While there, Agent Scoufis took an inventory of the guns in the shop to see if the inventory matched the BATF printout of what NFA firearms the store owner had registered with the BATF in accordance with Title 26 U.S.C. § 5845 (Ct.Tr., 75–78). On that day, Agent Scoufis noticed that there were firearms on his printout that were not in Mr. Katona Jr.'s inventory (Ct.Tr., 78). Mr. Katona Jr. told Agent Scoufis that the guns not in his inventory belonged to his son, Louis Katona, and that the printout did not distinguish between "Louis Katona Jr." and "Louis Katona III" (Ct.Tr., 78). Agent Scoufis decided to investigate the 41 firearms belonging to Louis Katona, because the dates on their transfer forms were after the date that Sheriff Shawber told him that the police chiefs in the county agreed to stop signing them (Ct.Tr., 79).

About a week later, Agent Scoufis returned to Bucyrus and went to the police department to talk to Chief Beran to find out if he was still signing the forms (Ct.Tr., 79). Chief Beran testified that he had signed forms for Mr. Katona after becoming the Chief of Police in 1986, but due to their disagreement over the badge, Chief Beran decided to follow the common policy in the county and not sign any more following Mr. Katona's resignation from the auxiliary police force on September 14, 1988 (Ct.Tr., 98). Chief Beran further stated that he had occasion to write Mr. Katona a letter explaining his new policy of not signing the forms. Allegedly, Chief Beran gave Agent Scoufis a copy of this letter, addressed to Louis Katona, dated August 1, 1989, in which Chief Beran explained that he was not signing those forms anymore (Ct.Tr., 83–85; Docket

No. 68, Attach). Chief Beran testified that he wrote the letter because a stack of blank forms had shown up on his desk and he was told that Mr. Katona had brought them in asking for the Chief to sign them (Ct.Tr., 185).

Because the date on many of the forms transferring Mr. Katona's guns was after September 14, 1988, Agent Scoufis contacted the criminal investigation division of the BATF within a day of his February meeting with Chief Beran, and spoke to Agent Lance Kimmell (Ct.Tr., 85–86). On April 20, 1992, Special Agent Lance Kimmell interviewed Chief Beran and showed him 40 BATF forms with Mr. Katona's name and the signature of Joe Beran on them (May 1992 Kimmell Aff., 1–2). Chief Beran stated that although he could not be sure whether he had signed the forms or not based solely on the signature, he was absolutely sure that he had not signed them based on the dates of the forms, as the forms were dated after September 14,

1988, which was when he stated he stopped signing them (Ct.Tr., 102). According to Agent Kimmell, Chief Beran then provided him with a copy of the August 1, 1989, letter to Mr. Katona, advising Mr. Katona that the Chief would sign no more forms for him (May 1992 Kimmell Aff., 2; Docket No. 68, Attach). At this time Agent Kimmell also knew of the disagreement between Chief Beran and Mr. Katona involving the badge (Kimmell Dep., 56–58).

On April 29, 1992, Agent Kimmell contacted Mary Colleen Davis, who is an NFA Specialist in the National Registration and Transfer Records Section within the BATF (May 1992 Kimmell Aff., 2; Ct.Tr., 337). Mrs. Davis stated that Mr. Katona had 41 NFA weapons registered to him in the National Registration and Transfer Record, 33 of which were registered after September 14, 1988, bearing the alleged signature of Chief Joseph Beran (May 1992 Kimmell Aff., 3; Ct.Tr., 350, 362).[2]

**2.** Those 33 weapons were:

1. Colt, M16, .223 caliber, automatic rifle, barrel length of 20″, overall length of 38.6″ bearing serial number 9044628.
2. AWC Systems Technology, MK2, .22 caliber, silencer, overall length of 6.1″, bearing serial number S–1018.
3. DLO, A/C, 30.06 caliber, machine gun, barrel length of 24″, overall length of 38½″, bearing serial number 86–70056.
4. Military Armament Corporation, SSSW (Stinger), .22 caliber, any other weapon, barrel length of 1.5″, overall length of 3.5″, bearing serial number 4–2000333.
5. Colt, AR–15 9 millimeter, SMG, 9 millimeter machine gun, barrel length of 10″, overall length of 26″, bearing serial number U886.
6. Smith & Wesson, 76, 9 millimeter machine gun, barrel length of 10″, overall length of 26″, bearing serial number TAO3363.
7. Heckler and Koch, G–3, .308 caliber machine gun, barrel length 18.5″, overall length 40.0″, bearing serial number A054906.
8. Valmet, 76, .223 caliber machine gun, barrel length 12½″, overall length 33″, bearing serial number 156936.
9. Sturm Ruger, KAC–556F, .223 caliber machine gun, barrel length 13″, overall length 33.75″, bearing serial number 191–09840.
10. X–Ring Custom Shop, M–2 carbine, .30 caliber machine gun, barrel length 18″, overall length 36″, bearing serial number X0–C706.
11. Colt, XM161E1, 5.56 millimeter machine gun, barrel length 20″, overall length 39″, bearing serial number SP180598.
12. Saco Defense Inc., M60E3, 7.62 millimeter machine gun, barrel length 24⅛″, overall length 42⅜″, bearing serial number 215566.
13. Auto–Ordnance Corporation, M1A1, .45 caliber, submachine gun, barrel length 10½″, overall length 32½″, bearing serial number 591910.
14. Automatic Weaponry, WP–870, .12 gauge, any other weapon, bearing serial number W998784M.
15. AWC Systems Technology, R10, .22 caliber silencer, overall length 14″, bearing serial number S1812.
16. X–Ring Custom Shop, Sten Mark–II, 9 millimeter machine gun, barrel length 7.75″, overall length 30.00″, bearing serial number X0–5900.
17. Sentinel Arms Corporation, Striker–12, .12 gauge, short barrel shotgun, barrel length 12″, overall length 31″, bearing serial number 001228.
18. Harrington and Richardson, Inc., M–14, 7.62 millimeter machine gun, barrel length 22″, overall length 44″, bearing serial number 818459.
19. Sturm Ruger, KAC–556GB, .223 caliber automatic rifle, barrel length 18.5″, overall length 37.25″, bearing serial number 191–13445.
20. Colt, M–16A1, 5.56 millimeter machine gun, barrel length 14″, overall length 28.78″, bearing serial number 175940.
21. Kanarr Corp., M–79, 40 millimeter, destructive device, barrel length 14″, overall length 28.78″, bearing serial number 175940.

In addition, Agent Kimmell discovered that the grenade launcher that he had obtained from Mr. Katona for use in the Oklahoma case was also registered with the BATF after September 14, 1988, bearing the alleged signature of Chief Joseph Beran (May 1992 Kimmell Aff., 5–6). When Agent Kimmell learned that the grenade launcher was possibly registered with a forged name, he stated that he contacted Agent Ward, told him of the situation and asked that the grenade launcher be forwarded to the Cleveland BATF at the conclusion of the Oklahoma criminal proceedings because it was going to be seized pursuant to 26 U.S.C. § 5861(b) (Kimmell Dep., 8; May 31, 1994, Kimmell Aff., ¶ 3c). Mr. Katona had periodically called the BATF agent, Special Agent Blair Ward, who was working on the Oklahoma case in order to learn the status of his grenade launcher. Mr. Katona has testified that Agent Ward was initially polite, but that on April 22, 1992, Agent Ward abruptly announced that Mr. Katona would not be getting his launcher back and that "no one needs an M203 anyway." (Oct. 25, 1993, Katona Aff., ¶ 9).

Based on the testimony of Chief Beran that he stopped signing the forms after September 14, 1988, and the letter dated August 1, 1989, which stated the same, Agent Kimmell believed that the alleged signatures of Chief Beran were forgeries in criminal violation of 26 U.S.C. § 5861(b) and § 5861(1) (May 1992 Kimmell Aff., 7).[3] Agent Kimmell prepared an affidavit and an application for a search warrant to search the premises at 1330 Oakridge Drive, Bucyrus, Ohio 44820, the residence of Louis E. Katona, and on May 7, 1992, Agent Kimmell appeared before Magistrate Judge Bartunek (May 31, 1994, Kimmell Aff., ¶ 12, ¶ 13). The affidavit stated that Agent Kimmell had reason to believe there was evidence of possession of 32 NFA firearms by Mr. Katona in violation of 26 U.S.C. §§ 5861(b) and 5861(1) (May 1992 Kimmell Aff., 7).[4] Magistrate Judge Bartunek issued the warrant on May 7, 1992, and ordered that Agent Kimmell search on or before May 17, 1992 (Docket No. 17, Ex. 1, Warrant).

On May 8, 1992, Agent Kimmell executed the federal search warrant on Louis E. Katona's home (Oct. 25, 1993, Katona Aff., ¶ 10). Agent Kimmell was accompanied by BATF Special Agent Stephen Wells and BATF supervisor, Stephen St. Pierre (St. Pierre Dep., 9). The three BATF agents stopped at the Bucyrus Police Station to get a uniformed officer to accompany them during the execu-

22. AWC Systems Technology, Warp 3, .22 caliber silencer, overall length 3.5", bearing serial number 90–104.
23. Colt, M–16A1, 5.56 millimeter machine gun, barrel length 20", overall length 39", bearing serial number 9602485.
24. Heckler and Koch, MP–5SD, 9 millimeter suppressed submachine gun, barrel length 5.7", overall length 30.5", bearing serial number 4092.
25. Erco. U.S. model of 1918–A2, .30–06 machine gun, barrel length 24.0", overall length 47.8", bearing serial number B0050.
26. AWC Systems Technology, 77/22 Ultra, .22 caliber suppressor, overall length 19", bearing serial number S70043861.
27. Knight's Armament Company, Stoner 63A, 5.56 millimeter machine gun, barrel length 20", overall length 40.25", bearing serial number 120.
28. Colt, M–203, 40 millimeter grenade launcher, barrel length 12", overall length 15.10", bearing serial number 0177920.
29. Group Industries, HR4332, .22, 9 millimeter + .45 caliber machine gun, barrel length 10.20", overall length 26.00", bearing serial number 100457.
30. X–Ring Custom Shop, MP–5K, 9 millimeter machine gun, barrel length 4.5", overall

length 12.8", bearing serial number XO–HK0002.
31. Knight's Armament Company, Stoner 63A, 5.56 caliber machine gun, barrel length 20", overall length 40.25", bearing serial number 121.
32. TRW–US, M–79, 40 millimeter destructive device, barrel length 14", overall length 28.78", bearing serial number 84515.
(May 1992 Kimmell Aff., 3–5)

3. 26 U.S.C. § 5861(b) states that it shall be unlawful for any person "to receive or possess a firearm transferred to him in violation of the provisions of this chapter." 26 U.S.C. § 5861(1) states that it shall be unlawful for any person "to make, or cause the making of, a false entry on any application, return, or record required by this chapter, knowing such entry to be false."

4. The Court has only unsigned copies of the affidavit used by Agent Kimmell to secure the warrant. The Court has no copy that was signed by Agent Kimmell, and no evidence that it was sworn to by him in the presence of Magistrate Judge Bartunek.

tion of the warrant (St. Pierre Dep., 15). Officer Agee was the Bucyrus police officer who accompanied them (St. Pierre Dep., 17–18). Agents Kimmell and St. Pierre drove to Mr. Katona's realty office, while Agent Wells and Officer Agee drove directly to Mr. Katona's home (St. Pierre Dep., 18). Mr. Katona's wife and mother were at the office and told the agents that Mr. Katona would return shortly (St. Pierre Dep., 18). Mr. Katona returned 15 minutes later, and the agents told him that they had a warrant to search his residence and they would like him to accompany them (St. Pierre Dep., 18–19). Mr. Katona contends that Agent Kimmell told him that Mr. Katona's car was not working and that Mr. Katona would have to ride with the agents to his residence (Oct. 25, 1993, Katona Aff., ¶ 10).[5] Mr. Katona went with them to his residence where they met up with Officer Agee and Agent Wells who had been waiting outside Mr. Katona's residence in their cars for approximately ½ hour for Mr. Katona and Agents Kimmell and St. Pierre (Wells Dep., 11–13).

Mr. Katona contends that he cooperated with the BATF agents by deactivating the security system surrounding his firearm collection, helping them locate the firearms described in the warrant and deactivating some of the firearms which were unfamiliar to the officers (Oct. 25, 1993, Katona Aff., ¶ 11). At some point during the seizure of the 32 firearms, Agent Kimmell showed Mr. Katona the warrant, and Mr. Katona saw that it was based on possible forgery of the forms because they were dated after Chief Beran stated he had stopped signing them for Mr. Katona, or anyone (Oct. 25, 1993, Katona Aff., ¶ 10). Mr. Katona then told Agent Kimmell and Agent Wells that Chief Beran had signed a stack of blank forms sometime in the past and told Mr. Katona that he could use them whenever he wanted (Claimant's Opposition to the Gov't's Mot. for Summary Judgment and Cross–Mot. for Summary Judgment, Docket No. 51, November 23, 1993, Kimmell Aff., ¶ 20). Agent Kimmell asked if Mr. Katona could produce any signed blank forms, and Mr. Katona said he had three more at his office (Nov. 23, 1993, Kimmell Aff., ¶ 20). After the search and seizure of the 32 firearms was completed, Mr. Katona, Attorney James W. Pry II, and Agents Kimmell and St. Pierre returned to Mr. Katona's office (Nov. 23, 1993, Kimmell Aff., ¶ 25). Mr. Katona was unable to find the three blank signed forms he claimed to have (Nov. 23, 1993, Kimmell Aff., ¶ 26).

Agent Wells and Officer Agee did not return to Mr. Katona's office after the search and seizure was completed (Plaintiff Mot. for Summary Judgment, Docket 50, Agee Dep., 25). They went back to the Bucyrus Police Department and Officer Agee testified that he told Agent Wells that he had concerns about the day's seizure because of the disagreement between Mr. Katona and Chief Beran (Agee Dep., 26; Wells Dep., 38–39).

On July 22, 1992, BATF sent Mr. Katona a letter informing him that they had instituted an administrative forfeiture proceeding against the 32 firearms that they had seized on May 8, 1992 (Docket No. 15, Ex. C–2). The letter explained that if Mr. Katona had an interest in the property and desired the forfeiture proceedings be transferred to United States District Court, he had to file a claim and cost bond in the amount of $2500 on or before the final claim date, listed as September 9, 1992 (Docket No. 15, Ex. C–2). Mr. James H. Jeffries III ("Mr. Jeffries"), Mr. Katona's lawyer, advised Mr. Katona that an administrative forfeiture was not appropriate in this case because the value of the property was more than $100,000, and administrative forfeiture is only available if the property is valued at less than $100,000 (Docket 15, 10; 26 U.S.C. § 7325). On September 9, 1992, Mr. Katona filed a claim and the $2500 cost bond with BATF to prevent the destruction of his firearms (Docket No. 15, Ex. C–3). The BATF returned Mr. Katona's claim and cost bond in a letter dated October 23, 1992, and explained that "it was not necessary to file a claim and cost bond on property in question. This matter will be handled by the judicial system. You will

---

**5.** An example of the hostility generated by the fact situation in this controversy is the contention of Mr. Katona that when he returned to his car that evening, he found that all four of the tires on his car had been flattened (Oct. 25, 1993, Katona Aff., ¶ 10).

receive a complaint from the U.S. Attorney office" (Docket No. 15, Ex. C–4).

On March 24, 1993, Mr. Katona, through his Cleveland counsel, filed a civil rights complaint against Chief Beran, the City of Bucyrus, the BATF agents who conducted the raid, and their supervisors. This case, *Katona, et. al. v. Beran, et al.,* Civil No. 5:93 CV 0638, is currently before this Court. This tort suit alleges that the BATF agents mishandled Kimberly Katona, Mr. Katona's wife, during the raid, causing the subsequent miscarriage of their child. At the same time, Mr. Katona also filed an administrative tort claim under the Federal Tort Claims Act with the United States Attorney in Cleveland and the BATF in Washington, D.C. (Oct. 25, 1993, Katona Aff., ¶ 15).

The next day, March 25, 1993, the United States Attorney's office, Assistant United States Attorney Robert E. Bulford, commenced a grand jury investigation against Mr. Katona (Nov. 23, 1993, Kimmell Aff., ¶ 35). On March 25 and March 26, grand jury subpoenas were issued and on March 31, 1993, witnesses appeared before the grand jury in Cleveland, Ohio (Nov. 23, 1993, Kimmell Aff., ¶ 35).

Mr. Bulford and Mr. Katona's lawyer, Mr. Jeffries, were in contact with each other through telephone calls and letters from the beginning of April of 1993 (Docket No. 51, Declaration of James H. Jeffries III, ¶ 4). Mr. Jeffries sent to Mr. Bulford the original forms for analysis by the government's forensic experts (Nov. 23, 1993, Kimmell Aff., ¶ 39). Mr. Jeffries also gave Mr. Bulford information about Mr. Katona and the circumstances surrounding the case. In a letter dated April 14, 1993, Mr. Jeffries provided Mr. Bulford with otherwise blank forms signed by Chief Beran which Mr. Katona's expert had determined were signed by the Chief (Jeffries Declaration, Attach.). Mr. Jeffries explained that those forms were to corroborate Mr. Katona's assertion that Chief Beran presented him with a number of signed but otherwise blank forms (Jeffries Declaration, Attach.). In that same letter,

Mr. Jeffries stated that Mr. Katona's fingerprint expert had been able to lift from the original forms some latent fingerprints which did not belong to the Katonas, and Mr. Jeffries asked the government to provide comparison prints of Chief Beran in order to check them (Jeffries Declaration, Attach.). Further, in that letter, Mr. Jeffries provided Mr. Bulford with the information of the disagreement between Chief Beran and Mr. Katona which led to Mr. Katona's resignation from the auxiliary police force, and information about Mr. Katona, including the absence of any criminal record and letters of reference attesting to his good character (Jeffries Declaration, Attach.). Mr. Jeffries also agreed to arrange for Mr. Katona and his wife to appear before the BATF in Cleveland and give fingerprint and handwriting exemplars (Oct. 25, 1993, Katona Aff., ¶ 16). In that letter and in another dated April 24, 1993, Mr. Jeffries tried to demonstrate to Mr. Bulford that the failure to follow administrative instructions on the BATF forms, which purported to require the applicant's signature in the presence of the law enforcement certifier, was not something the applicant could control and was not, in any event, a criminal offense (Jeffries Declaration, Attach.).

On June 8, 1993, the BATF sent Mr. Katona a letter of intent to administratively forfeit the grenade launcher that was being used in the Oklahoma criminal proceedings (Docket No. 15, Ex. C–5). The letter stated that if Mr. Katona desired the forfeiture proceedings be transferred to United States District Court, he had to file a claim and cost bond by the final claim date, listed as July 18, 1993 (Docket No. 15, Ex. C–5). On July 10, 1993, Mr. Katona filed a claim and $350 cost bond with respect to the grenade launcher (Docket No. 15, Ex. C–5).[6]

On August 17, 1993, the government's fingerprint expert, Mr. Rick P. Johnson, sent Mr. Bulford the results of his tests, which results "shall supersede all previous Document Reports" (Docket No. 51, Ex. 7–J). Mr. Johnson had been given handwriting ex-

---

6. The Court's copy of the claim submitted by Mr. Katona through his attorney Mr. Jeffries is un-

signed by both Mr. Katona and Mr. Jeffries.

emplars from Mr. Katona, Kimberly Katona, Mr. Katona Jr. and Chief Beran (Docket No. 51, Ex. 7–J). Mr. Johnson compared those exemplars with the 81 transfer forms of Mr. Katona (Docket No. 51, Ex. 7–J). Mr. Johnson concluded, and testified at the criminal trial before Judge White, that Chief Beran could not be ruled out as the author of 25 of those forms (Document No. 51, Ex. 7–J; Ct. Tr., 466). These results were identical to the results of Mr. Theodore C. Whitcomb, Mr. Katona's handwriting expert, who had concluded on April 14, 1993, that those same 25 forms could have been signed by Chief Beran (Docket No. 51, Ex. 7–F). Mr. Johnson further testified under cross-examination at the trial before Judge White that three of the forms that were in the group of 25 that could have been signed by Chief Beran were otherwise-blank undated forms (Ct.Tr., 469). Mr. Johnson, the government's expert, further testified that he could not come to any conclusions about Mr. Katona based on the 100 exemplars Mr. Katona had submitted (Ct.Tr., 449–450). Mr. Johnson testified that this was because there were indications that Mr. Katona might not have written in his natural handwriting (Docket No. 51, Ex. 7–J). There were similarities between the handwritten dates next to the "Louis E. Katona" signatures and the "Joe Beran" signatures, but due to the discrepancies noted with respect to the collected exemplars of Mr. Katona, Mr. Johnson was unable to make a further association (Docket No. 51, Ex. 7–J). Mr. Johnson also concluded that there was "[n]othing of specific interest" noted in comparison of the "Joe Beran" signatures with the signatures of Kimberly Katona, Louis E. Katona Jr., or Lisa Russell, Chief Beran's secretary (Docket No. 51, Ex. 7–J).

The United States then sought to stay the civil tort suit because of its criminal investigation (Oct. 25, 1993, Katona Aff., ¶ 17). This Court refused an unlimited stay, but stayed the action until September 1, 1993, and directed the United States to report on the status of the criminal investigation by that date (Oct. 25, 1993, Katona Aff., ¶ 17). On September 1, the Assistant United States Attorney assigned to the civil case sent this Court a letter advising that the "investigative stage" of the criminal investigation would "be concluded by the end of September 1993" (Oct. 25, 1993, Katona Aff., ¶ 18).

On September 13, 1993, Agent Kimmell testified before the Grand Jury. Mr. Bulford examined him and asked the following question:

Q: Now, Let's take the worst case scenario for your investigation. Let's say that Chief Beran gave him a stack of blank forms.

A: Okay.

Q: There's still a violation here?

A: That is correct.

Mr. Bulford: Does everybody understand that? Of course, Beran then would be accomplicitory in that thing, but there's still a violation?

(Claimant's Mot. in Opposition to the Gov't's Mot. for Certificate of Reasonable Cause, Docket No. 21, Transcript of Grand Jury proceedings, 27). On September 14, 1993, the Grand Jury returned a 19–count indictment against Mr. Katona, charging him with making false representations on his transfer forms by representing that he had obtained the signature of Chief Beran when he had not (Plaintiff Mot. to Issue a Certificate of Reasonable Cause, Docket No. 18, Ex. 5). The indictment further charged that Mr. Katona's with a criminal violation of failing to follow the instructions on the form which required the transferee to sign the form in the presence of the law enforcement officer (Docket No. 18, Ex. 5).[7]

On October 28, 1993, the United States filed the complaint in this forfeiture action (Compl.). The complaint was for the judicial forfeiture of the 32 firearms that were seized from Mr. Katona's residence on May 8, 1992, and the grenade launcher that was obtained from Mr. Katona by Agent Kimmell on April 26, 1991 (Compl.). The complaint further alleged that the defendant 33 firearms were subject to forfeiture pursuant to 26 U.S.C. § 5872, because they were involved in viola-

---

7. Judge Battisti, to whom the criminal case was originally assigned, ruled non-criminal the failure to sign the form in front of the law enforcement officer, and ordered it stricken from the indictment (Jeffries Declaration, ¶ 5).

tions of the provisions of Chapter 53, Title 26, U.S.C. (Compl., ¶ 8). Mr. Katona filed his claim to the defendant 33 firearms on November 9, 1993 (Docket No. 7). On November 12, 1993, this Court granted Mr. Katona's motion to stay the forfeiture action until completion of the criminal case against him, *United States v. Katona,* Case No. 5:93 CR 275 (Docket No. 12).

The criminal trial began on April 19, 1994, before Judge George W. White. Judge White heard the government's case against Mr. Katona, which included testimony from Sheriff Shawber, Agent Scoufis, Agent Kimmell, Chief Beran, Lisa Russell, and Mr. Johnson (Ct.Tr.). After the government rested, Mr. Katona's attorney moved for a judgment of acquittal (Ct.Tr., 562). Mr. Katona's attorney stated the basis for such an acquittal was that the issue was whether Mr. Katona forged the signature of Chief Beran, and the jury heard no evidence that Mr. Katona forged even one signature (Ct.Tr., 562). He continued: "[T]he only way a reasonable juror could find proof beyond a reasonable doubt is to speculate, and speculation is not permitted" (Ct.Tr., 563).

On April 25, 1994, Judge White granted Mr. Katona's motion for a judgment of acquittal (Ct.Tr., 2). He held that after hearing the government's case, the phrase that kept running through his mind was: "Where's the beef?" (Ct.Tr., 2). He held that there was no violation of the law if Mr. Katona did not sign the forms in the presence of Chief Beran: "[i]t is just a provision that is put in on the form" (Ct.Tr., 2). Then Judge White addressed the forgery issue: "It seems to me that we come here to intent [sic] of the person that is charged guilty knowledge, and in order to sustain the government's case at this point we have inferences that could very well suggest innocence as opposed to inferences that suggest guilt. I don't think that's enough at this point of the government's case to have those inferences out there." (Ct.Tr., 3)

Following Judge White's grant of acquittal to Mr. Katona on April 25, 1994, the government made a motion for voluntary dismissal in the instant forfeiture case on June 3, 1994 (Docket No. 19). On that same day, June 3, 1994, the government also made a motion for the issuance of a certificate of reasonable cause (Docket No. 18). On September 2, 1994, this Court granted the government's motion for voluntary dismissal of the forfeiture case on terms and conditions including the return of the defendant 33 firearms to Mr. Katona's residence by BATF agents other than the three agents named in the complaint in Case No. 5:93 CV 638 (Docket No. 33). The Court further ordered that issues relating to fees and costs and the issuance of a certificate of reasonable cause would be addressed following the return of the weapons in accordance with the Court's order (Docket No. 33). On September 23, 1994, the government notified the Court that on September 19, 1994, the United States returned the defendant 33 firearms to Louis E. Katona in compliance with each of the terms set forth in the Court's Order (Docket No. 35). Mr. Katona then made a renewed motion for attorney fees and costs (Docket No. 36).

The Court held an evidentiary hearing on May 5, 1995, on the issue of the issuance of a certificate of reasonable cause. The parties have also filed memorandums in support of their positions concerning the two motions.

### III. Procedural Stages of In Rem Forfeiture Actions

In this case, the government contends it is the initial evidentiary seizure on May 8, 1992, which is the seizure to be considered in determining reasonable cause for purposes of issuing a certificate. For the reasons explained below, the Court finds that it is not the May 8, 1992, seizure, but rather the November 16, 1993, seizure pursuant to the "warrants for seizure and monition" which was the seizure for forfeiture purposes and so is the seizure to be considered for reasonableness with regards to a certificate of reasonable cause.

The Court finds it appropriate first to review and explain the stages of an in rem forfeiture proceeding to understand the terminology and procedures that apply.

### A. The Stages in a Forfeiture Action for a Federal Statutory Violation

■ The Sixth Circuit has held that a forfeiture proceeding based on a federal statutory violation, such as in this case, brought

pursuant to 26 U.S.C. §§ 5872 and 7323, is governed by the Supplementary Rules for Certain Admiralty and Maritime Claims. *United States v. One Assortment of Eighty–Nine Firearms and Six Hundred and Thirty–Eight Rounds of Ammunition,* 846 F.2d 24, 26 (6th Cir.1988) (discussing civil forfeiture proceeding of firearms initiated pursuant to 26 U.S.C. § 5872(a)). *See generally* James Wm. Moore & Alfred S. Palaez, 7A J. *Moore's Federal Practice* ¶ C.11 (2d ed. 1988 and Supp.1992–1993) (applicability of the Supplemental Rules to judicial forfeiture actions).[8] The first step in an in rem forfeiture proceeding is the seizure of the property. This is because in an in rem forfeiture proceeding, unlike in other in rem proceedings, "[s]eizure is a condition precedent to filing the Complaint." [9] James Wm. Moore & Alfred S. Palaez, 7A J. *Moore's Federal Practice* 669 (2d ed. 1988 and Supp.1992–1993). As Justice Story so long ago stated in *The Brig Ann,* 13 U.S. (9 Cranch) 289, 291, 3 L.Ed. 734 (1815):

> In order to institute and perfect proceedings in rem, it is necessary that the thing should be actually or constructively within the reach of the court. It is actually within its possession when it is submitted to the process of the court; it is constructively so, when, by a seizure, it is held by a judicial decree in rem.... It follows, from this consideration, that before judicial cognizance can attach upon a forfeiture in rem, under the statute, there must be a seizure; for until seizure it is impossible to ascertain what is the competent forum. *And, so, it must be a good subsisting seizure at the time when the libel* [10] *or information is filed and allowed.*

*Id.* (emphasis and footnote added). *See also The Silver Spring* 22 F.Cas. 144, 145

(D.Mass.1854) (No. 12,858) ("And no cases give color to the theory, that where the vessel, at the time of filing the libel, is within the district, there need be no seizure.... And the court, before issuing a warrant to arrest the vessel, will see that the libel alleges a seizure. Some actual taking is necessary to give this court jurisdiction."). After the seizure of the property, the United States may begin the judicial forfeiture by filing a complaint in the district where the seizure occurred. Supplemental Rule C(2) states what the complaint must include:

> In actions in rem the complaint shall be verified on oath or solemn affirmation. It shall describe with reasonable particularity the property that is the subject of the action and state that it is within the district or will be during the pendency of the action. In actions for the enforcement of forfeitures for violation of any statute of the United States the complaint shall state the place of seizure and whether it was on land or on navigable waters, and shall contain such allegations as may be required by the statute pursuant to which the action is brought.

Supplemental Admiralty and Maritime Claims Rule (hereinafter "Supp.R.") C(2), 28 U.S.C. As the next step in the forfeiture proceeding, upon the filing of the complaint, the clerk issues a warrant for the arrest of the property: "In actions by the United States for forfeitures for federal statutory violations, the clerk, upon filing of the complaint, shall forthwith issue a summons and warrant for the arrest of the vessel or other property." Supp.R. C(3).[11]

After the clerk has issued the warrant for the arrest of the property, he delivers it to

---

**8.** A judicial forfeiture is one involving property valued at more than $100,000; property valued at less than $100,000 is subject to administrative forfeiture, which has some different procedural steps. 26 U.S.C. § 7325.

**9.** *But see United States v. Beechcraft Queen Airplane,* 789 F.2d 627 (8th Cir.1986) (upholding jurisdiction in forfeiture cause where complaint was filed prior to seizure of the res).

**10.** "Libel," according to Black's Law Dictionary was formerly the initial pleading in an admiralty action. Since 1966, however, the Federal Rules of Civil Procedure and Supplemental Admiralty

Rules have governed admiralty actions, and such actions are now commenced by the filing of a complaint. *Black's Law Dictionary* 916 (6th ed. 1990); Fed.R.Civ.P. 1, 3 & 81.

**11.** In 1985 this rule was amended to require judicial review before the issuance of a warrant of arrest of property in forfeiture actions other than forfeitures for federal statutory violations. A careful reading of the Sixth Circuit opinion in *One Assortment of Eighty–Nine Firearms,* 846 F.2d 24, 26 (1988), shows that the court, in its decision involving an in rem forfeiture proceeding, cited as applicable to that situation the amended Supplemental Rule C(3) procedure for

the marshal or other authorized person. The marshal or other authorized person then executes or serves the warrant for arrest of the property by taking the property into actual possession pursuant to Supp.R. E(4)(b), or by taking it into constructive possession by other means pursuant to Supp.R. E(4), which governs the execution of process of the warrant for arrest of the property. *See* Supp.R. C(3). Service of process, or execution, on tangible property is done by taking that property into possession, *see* Supp.R. E(4)(b), while service of process on intangible property is done by leaving a copy of the complaint and process with the garnishee or other obligor. *See* Supp.R. E(4)(c). The person serving process shall file a process return and receipt form indicating when the warrant was served on the property. *See* Supp.R. E(4)(a); Fed.R.Civ.P. 4(g). *See generally United States v. Approximately 2,538.85 Shares of Stock,* 988 F.2d 1281, 1284 (1st Cir.1993) (describing stages of in rem forfeiture proceeding brought under Supplemental Rules for Certain Admiralty and Maritime Claims). If the property is not released within 10 days, the United States must publish a notice of the arrest of the property in a newspaper of general circulation in the district. Supp.R. C(4). Supplemental Rule C(6) then states that the claimant of the property involved in the action must file a claim within 10 days after process has been executed and must file an answer within 20 days after the filing of the claim. Following these steps, the case proceeds toward trial to determine whether the property seized is actually forfeitable.

## B. The Procedural Stages, as Implemented, in this Case

On May 8, 1992, the 32 defendant firearms were seized pursuant to a warrant issued the previous day, May 7, 1992, by Magistrate Judge Bartunek. The Magistrate Judge issued the "search warrant" (captioned as such) on the basis of Agent Kimmell's May 1992 affidavit testimony that "there is evidence of possession of firearms required to be lawfully registered under the National Firearms Act by Louis Edward Katona III, in violation of Title 26, U.S.C., § 5861(b) and § 5861(1)."

On October 28, 1993, sixteen months after the seizure, the United States filed the complaint in this case. The complaint alleged that the defendant 33 firearms were subject to forfeiture pursuant to 26 U.S.C. § 5872 because they were involved in violations of the provisions of Chapter 53, Title 26, United States Code. Contemporaneously with the filing of the complaint, the United States filed two additional documents: (1) a motion (Docket No. 4) for "an order for publication of notice regarding the defendant firearms, pursuant to Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims"; (2) a praecipe [12] (Docket No. 5) ordering the issuance of "Warrants of Seizure and Monition to the United States Marshal on behalf of the United States Attorney's Office." The United States submitted its praecipe for the issuance of "Warrants of Seizure and Monition" despite the fact that Supp.R. C does not make reference to such monition warrants. On that same day, October 28, 1993, following the filing of the complaint, the clerk issued a "Warrant and Monition" for each of the defendant 33 firearms listed in the complaint. That "Warrant and Monition" ordered the Marshal to seize the firearms, *notify all who claim an interest in the property and then to make a return when*

non-forfeiture in rem procedures, which requires court review of the complaint and court authorization of a warrant for the arrest of the property that is involved in the action. In *One Assortment of Eighty–Nine Firearms,* however, the forfeiture was for a statutory violation and Rule C(3) states that in such an in rem forfeiture action for a federal statutory violation, the clerk shall issue the warrant without the need for prior court review of the complaint. Thus, it appears that the court cited the incorrect part of Rule C(3) as applicable to the forfeiture proceeding involved. However, in its final holding, the court dealt with

Supplemental Rule C(6), concerning the timing of the filing of the claimant's claim, and so its citation of the inapplicable rule for forfeiture proceedings does not affect this Court's decision here.

12. A "praecipe" is an original writ drawn up in the alternative including an order to the clerk of court to issue an execution on a judgment already rendered. *Black's Law Dictionary* 1172 (6th ed. 1990).

the Marshal had the property in custody. The address on the warrants from which the Marshal was to seize the firearms, was: Alcohol, Tobacco & Firearms, 55 Erieview Plaza Suite 500, Cleveland, Ohio 44114. The Marshal received the warrants on November 16, 1993, executed them that same day and then filed his return (Docket No. 13) on November 22, 1993. On November 3, 1993, this Court (Docket No. 6) issued an order stating that publication of notice of the filing of the forfeiture action, pursuant to Rule C(4) of the Supplemental Rules for Certain Admiralty and Maritime Claims, would be in the *Bucyrus Telegraph Forum* and would give "persons in interest ten (10) days within which to file a claim and twenty (20) days, after filing of the claim, within which to file an answer."

On October 29, 1993, the United States delivered to Mr. Katona a notice of the forfeiture action and a copy of the complaint. *See* Return of Service (Docket No. 9).

On November 8, 1993, Mr. Katona filed his claim (Docket No. 7) for the defendant 33 firearms.

## C. Terminology: "Warrant and Monition" and "Warrant for the arrest of property"

There is some confusion in the terminology used in describing in rem forfeiture proceedings. The Sixth Circuit's decision in *One Assortment of Eighty–Nine Firearms and Six Hundred and Thirty–Eight Rounds of Ammunition*, 846 F.2d at 26, is one example of how courts sometimes use imprecise terminology even though they recognize the Supplemental Rules for Certain Admiralty and Maritime Claims as the controlling authority. In that case, the court referred to a "warrant of seizure and monition" that was issued after the filing of the complaint and was executed by the marshal by seizing the firearms even though the Supplemental Rules no longer provide for monition warrants. Instead Supplemental Rule C(3) states the clerk shall issue a "warrant for the arrest" of the property involved in the action which is done after the filing of the complaint. In the instant case, the clerk issued a "warrant and monition" for each of the de-

fendant 33 firearms after the filing of the complaint; but did not issue a "warrant for the arrest" of the firearms.

The phrase "warrant and monition" has a long history in in rem forfeiture proceedings. Early on, courts explained the "warrant and monition" as the warrant issued after the filing of the complaint that orders the marshal to seize the property listed in the complaint and notify the persons who have a claim on the property. *See Ex Parte Hoyt*, 38 U.S. (13 Pet) 279, 283 & 288, 10 L.Ed. 161 (1839) (Justice Story upheld the district court's interpretation of the stages of a forfeiture action in rem as follows: "[t]he first of these 'proceedings,' according to the uniform practice of the court, is the preparation and filing of the libel. The second 'proceeding' is the issuing of the monition and warrant of attachment, in pursuance of the prayer of libel. The third is, the delivery of the monition and warrant to the marshal; and the fourth 'proceeding' is, the service of this process by the marshal."); *Miller v. United States*, 78 U.S. (11 Wall.) 268, 292–293, 20 L.Ed. 135 (1870) (following the filing of a complaint, "a warrant and monition were issued, commanding the marshal to hold the stocks and property thus described, the same having been by him duly seized, until the further order of the court touching the same, and to give notice, as prescribed, that all persons having any interest in said property ... might appear before the court ... and make their allegations in that behalf"); *In re 4,885 Bags of Linseed*, 66 U.S. (1 Black) 108, 109, 17 L.Ed. 35 (1861) (after filing of the complaint, "warrant and monition were issued, and the goods seized by the marshal in pursuance thereof").

The Supplemental Rules of Certain Admiralty and Maritime Claims were created in 1966 as the unification of the civil and admiralty procedures. James Wm. Moore & Alfred S. Palaez, 7A J. *Moore's Federal Practice* ¶ .01[1] (2d ed. 1988 and Supp.1992–1993). These rules have replaced the historical phrase "warrant and monition" with "warrant for the arrest of the property." The "warrant for the arrest of the property" now refers to the warrant which is issued after the filing of the complaint and which

orders the marshal to seize the property listed in the complaint. In fact, under "monition" in Black's Law Dictionary it is now written: "In admiralty, formerly the summons to appear and answer, issued on filing the libel; which was either a simple monition *in personam* or an attachment and monition *in rem*. With the unification of the Admiralty Rules and Federal Rules of Civil Procedure in 1966, the monition was abolished." *Black's Law Dictionary* 1006 (6th ed. 1990). A "general monition" still exists in civil practice, and is a "summons to all parties in interest to appear and show cause against the decree prayed for." *Id.* A "warrant and monition" may still be issued in an in rem forfeiture proceeding, but it has been held to mean only an order to the marshal to publish a newspaper announcement to notify all parties having a claim in the property. *Approximately 2,538.85 Shares of Stock,* 988 F.2d at 1283. There, in an in rem forfeiture proceeding, two warrants were issued by the clerk on the same day: one was for a "warrant for arrest *in rem*," ordering the marshal to seize the property and notify the claimants; the second was a warrant for "seizure and monition," ordering the marshal to publish the newspaper announcement to notify all claimants. *2,538.85 Shares of Stock,* 988 F.2d at 1283. Further, in *2,538.85 Shares of Stock,* the court held that even when a "warrant and monition" is issued, a "warrant for the arrest" of the property must still be issued to effectively seize the property, in accordance with the Supplemental Rules. 988 F.2d at 1286. There the court held that the "process" described in Supplemental Rule C(3) to seize the property means the issuance and execution of the "warrant for arrest *in rem,* and that process is executed by service upon the property subject to forfeiture." 988 F.2d at 1286.

In this case, the procedure, as set out by the Supplemental Rules for Certain Admiralty and Maritime Claims was followed, with the exception of some confusion concerning the terminology. The United States filed its complaint and then asked for publication of notice in the newspaper for all who might claim an interest in the property. In addition the United States asked for "warrants of seizure and monition" to be issued to the marshal's office. The Court ordered publication in the newspaper, and the clerk issued the "warrants and monitions" to the marshal ordering him to seize the property from the BATF office in Cleveland, to notify the claimants and to make a return when the marshal seized the property. This Court finds the "warrants and monitions" that were issued in this case for the seizure of the defendant 33 firearms on October 28, 1993, to be the functional equivalent of the "warrants for the arrest" required by Supp.R. C(3).

## IV. Certificate of Reasonable Cause

The issuance of a certificate of reasonable cause rests upon 28 U.S.C. § 2465, which provides:

> Upon the entry of judgment for the claimant in any proceeding to condemn or forfeit property *seized under any Act of Congress,* such property shall be returned forthwith to the claimant or his agent; but if it appears that there was *reasonable cause for the seizure,* the court shall cause a proper certificate thereof to be entered and *the claimant shall not, in such case, be entitled to costs, nor shall the person who made the seizure,* nor the prosecutor, *be liable to suit or judgment* on account of such suit or prosecution.

(emphasis added).

## A. Legal Standard for Issuance of a Certificate of Reasonable Cause

■ A certificate of reasonable cause is designed to "protect the person at whose instance the seizure was made, should an action of trespass be brought against him by the claimant for the wrongful seizure of the latter's property." *United States v. Abatoir Place,* 106 U.S. (16 Otto) 160, 162, 27 L.Ed. 128 (1882). *See also United States v. Parcels of Real Property with the Building, Appurtenances, and Improvements Located at 255 Broadway,* 795 F.Supp. 1225, 1229 (D.Mass. 1992), *aff'd,* 9 F.3d 1000 (1st Cir.1993). Courts have elaborated upon this idea of the certificate as a way to "protect" officials who are responsible for seizing potentially forfeitable property. *See Parcels of Real Property,* 795 F.Supp. at 1229; *United States v. 83 Sacks of Wool and 5,974 Sheepskins,* 147 F. 747, 749 (D.Me.1906) (court held that certifi-

cate should be issued on a finding of reasonable cause, "for, unless government officers shall feel assured that they will receive the protection of the courts in cases where they acted faithfully, carefully, and reasonably, they may become too timid for the performance of their grave and important duties"). Another judge of this Court recently reiterated that "Congress enacted this section 'for the important purpose of preventing the "chilling" effect that liability for improvident seizures based on reasonable cause might have on the government.' " *United States of America v. $47,409.00 in U.S. Currency,* Case No. 1:92 CV 742 at 1 (N.D.Ohio April 5, 1993) (quoting *United States v. All Monies ($637,944.57) in Acc. 29–0101–62,* 746 F.Supp. 1441, 1446 (D.Hawaii 1990). In this manner, courts read 28 U.S.C. § 2465 to reflect a "concern that officials be able to pursue their duties to seize potentially forfeitable property without the cloud of a future lawsuit or costs dampening their zeal. As long as they are armed with 'reasonable cause' ... such officials may act unencumbered by fear of reprisal." *Parcels of Real Property,* 795 F.Supp. at 1230.

The United States Supreme Court holds that with regards to the certificate of reasonable cause, "reasonable cause" is the same thing as "probable cause." *E.g., Stacey v. Emery,* 97 U.S. (7 Otto) 642, 646, 24 L.Ed. 1035 (1878). There the Court held that "[i]f there was a probable cause of seizure, there was a reasonable cause." *Stacey, supra,* at 646. The Sixth Circuit has defined probable cause as "reasonable ground for belief of guilt, supported by less than *prima facie* proof but more than mere suspicion." *United States v. $67,220.00 in U.S. Currency,* 957 F.2d 280, 284 (1992) (citations omitted). Finally, the Sixth Circuit also has held that the return of an indictment by a grand jury is evidence of probable cause. *Friedman v. United States,* 927 F.2d 259, 262 (6th Cir. 1991) (citation omitted).

Courts have then addressed the question of when, for purposes of the certificate, rea-

sonable cause should be tested. Because courts have held that 28 U.S.C. § 2465 was enacted to protect the officials responsible for the seizure of potentially forfeitable property, courts generally look to the moment of seizure in considering whether or not to grant the certificate. *Parcels of Real Property,* 795 F.Supp. at 1230. Thus, "rather than considering later developments which either support or counsel against the issuance of the certificate, courts limit their review to the evidence as it existed *at the time of seizure* for purposes of assessing whether 'reasonable cause for the seizure' existed within the meaning of the statute." *Parcels of Real Property,* 795 F.Supp. at 1230. *See also $47,409.00 in U.S. Currency,* Case No. 1:92 CV 742, at 2; *All Monies,* 746 F.Supp. at 1445 (court looked to information government had at time of seizure; government cannot rely on evidence discovered after seizure to support certificate of reasonable cause); *United States v. One (1) 1984 Mercedes Benz,* 673 F.Supp. 387, 395, 396 (D.Haw.1987) (for purposes of certificate, reasonable cause based on information government had when they seized the property); *United States v. Property Identified as 1300 Florida Ave., N.E. Washington, D.C.,* No. Civ.A. 88–3409–LFO, 1989 WL 315184, *2 (D.D.C. Sept. 19, 1989) (subsequent assertion of innocent owner defense did not negate government's "original justification for seizing the property in the first instance").

Courts have further addressed the issue of which "seizure" is the one to be tested for purposes of issuing the certificate of reasonable cause: the initial seizure pursuant to a search warrant or the seizure pursuant to a "warrant for the arrest" of the property, issued after the filing of the complaint. Recently, another judge of this Court, in an unpublished opinion, *$47,409.00 in U.S. Currency,* Case No. 1:92 CV 742, at 3–4, held that a certificate of reasonable cause is appropriate where there has been a showing of probable cause at the "warrant and monition" [13] stage.[14] In its opinion, the

13. The Court is of the view that "warrant and monition" is the functional equivalent of the "warrant for the arrest" of the property, as required in the Supp.R. *See* discussion *supra.*

14. The court's decision in *$47,409.00 in U.S. Currency* is not dispositive here because it provides far too few facts to draw close analogies to the case at bar; and because there, the court did not

*$47,409.00 in U.S. Currency* court adopted the reasoning of Judge Woodlock of the District of Massachusetts in *Parcels of Real Property,* 795 F.Supp. at 1232, which this court finds instructive in this case.[15] In *Parcels of Real Property,* the court noted that there had been three determinations of probable cause: "First, the clerk magistrate found probable cause to search 255 Broadway. Then, after the government filed its forfeiture complaint, [the court] found probable cause to issue a warrant and monition for the official seizure of the property. Finally, at the evidentiary hearing on the currency in the hutch, [the court] found that the government had not established probable cause for the forfeiture of the currency." 795 F.Supp. at 1231.

In its decision, the Massachusetts District Court began by stating that 28 U.S.C. § 2465 is to protect officials who, armed with reasonable cause to believe in the forfeitability of the property, seize property for forfeiture proceedings, but are later proven wrong. *Parcels of Real Property,* 795 F.Supp. at 1232. The court then held that the determination of probable cause at the "warrant and monition" stage was enough, standing alone, to issue the certificate of reasonable cause. 795 F.Supp. at 1233. The court explained that this was enough because if a court has been persuaded that probable cause for seizure exists, and court issues a warrant for seizure and monition, the marshal or other authorized official who obtains the warrant "must be permitted to rely on that warrant in its execution if the warrant is to serve its function of facilitating valid forfeiture." 795 F.Supp. at 1233. Attached to this sentence was a footnote that the *$47,409.00 in U.S.*

*Currency* court failed to acknowledge in its extensive quotation of the case and that this Court finds particularly instructive: "I refer here, of course, to the warrant for seizure pending forfeiture. A simple search warrant, such as the one issued initially by a magistrate in this case, only authorizes seizure for evidentiary purposes. A warrant and monition for seizure, on the other hand, authorizes seizure for the ultimate purpose of forfeiture." 795 F.Supp. at 1233 n. 5. It is therefore the seizure pursuant to a "warrant for the arrest" of the property which is to be tested for its reasonableness for purposes of the issuance of the certificate because it is this seizure that brings the property to the jurisdiction of the court for forfeiture purposes.

That "the seizure" that brings the property within the court's in rem jurisdiction is the one to be tested for certificate purposes is further shown by the recent First Circuit decision in *2,538.85 Shares of Stock,* 988 F.2d 1281, 1286 (1993). The First Circuit held that in a forfeiture proceeding governed by the Supplemental Rules, there has been no execution of process of the forfeiture until the issuance of a "warrant for arrest *in rem,* and that process is executed by service upon the property subject to forfeiture." *Id.* at 1286. Thus, because the property is not actually seized for forfeiture purposes until it has been executed upon by the warrant for arrest in rem, the "seizure" contemplated by 28 U.S.C. § 2465 is the seizure accomplished through a warrant of arrest; and that is the seizure that must be tested for reasonableness.

---

differentiate between a "warrant and monition" and a "warrant for the arrest" of property.

**15.** In *Parcels of Real Property,* after DEA agents observed the delivery of marijuana to the address, the agents obtained search warrants on July 23, 1988, and executed them at 4:30 a.m. the following morning, seizing marijuana, cocaine and cash being stored in a hutch. On May 25, 1989, the government filed a complaint for forfeiture in rem of, *inter alia,* the cash that was seized. On June 1, 1989, at the government's request, the district court issued a warrant and monition for, *inter alia,* all of the seized cash. The claimant, mother of a convicted drug dealer, filed notice of claim. Following judgment in

favor of claimant with regard to the currency, the government moved for a certificate of reasonable cause and claimant moved for attorney fees. The District Court issued a certificate of reasonable cause based on the court's issuance of a "warrant of seizure and monition," and held that while the issuance of the certificate barred an award of "costs" to the successful claimant, it did not bar an award of attorney fees under the Equal Access to Justice Act ("EAJA"), as attorney fees are not contemplated in "costs." In *Parcels of Real Property,* however, the court held that the government's position was substantially justified, so no award under the EAJA was appropriate.

The issuance of a "warrant for the arrest" of the property does not, however, bar any § 2465 inquiry. The officer's reliance on the warrant must itself be reasonable in order for him to claim "reasonable cause." *Parcels of Real Property*, 795 F.Supp. at 1233. There, the court adopted by analogy the approach taken by the United States Supreme Court in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The *Leon* Court explained that in the absence of a showing that the magistrate who issued the warrant was not neutral and detached, suppression of evidence seized under that warrant would be appropriate as a Fourth Amendment sanction only "if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Leon*, 468 U.S. at 926, 104 S.Ct. at 3422. *See also Parcels of Real Property*, 795 F.Supp. at 1233. In applying the *Leon* rule to the issuance of a certificate for reasonable cause, the *Parcels of Real Property* court explained that no certificate should issue if "circumstances at the time of seizure precluded any objectively reasonable reliance on the *warrant and monition* as a memorialization of probable cause to seize." 795 F.Supp. at 1233 (emphasis added). The court then issued the certificate because "there was no allegation that, prior to or concurrent with seizure, facts came to light that would have undermined a reasonable faith in the adequacy of probable cause." 795 F.Supp. at 1233.

## B. Application of the Law to the Facts

In the instant case, the government has moved for a certificate of reasonable cause pursuant to 28 U.S.C. § 2465. The initial question is the applicability of that section to this situation, where the government was granted a voluntary dismissal pursuant to Rule 41(a)(2), and there has been no "judgment" for the claimant, Mr. Katona. The government argues that the Court should apply the section to this situation. Although 28 U.S.C. § 2465, on its face, applies only to actions in which "judgment" has been entered for the claimant, it has been applied to actions where the government has been granted an order dismissing the forfeiture action pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure. *United States v. Property Identified as 1300 Florida Ave., N.E. Washington, D.C.*, No. Civ. A. 88–3409–LFO, 1989 WL 315184 (D.D.C. Sept. 19, 1989).[16] The court in *1300 Florida Ave.*, 1989 WL 315184, at *2, reasoned that because 28 U.S.C. § 2465 was designed to limit governmental liability, it's consideration would be appropriate when the government has voluntarily dismissed the forfeiture action. Here, Mr. Katona has not offered, and the Court has not found, any authority in opposition to that position. Further, the Court finds persuasive the *1300 Florida Ave.* reasoning that the principles of 28 U.S.C. § 2465, which were to limit the government's liability in forfeiture actions, do apply to this situation. The Court finds that 28 U.S.C. § 2465 should be considered in this situation where the government was granted a motion for voluntary dismissal even though there was no "judgment" for Mr. Katona.

The second question goes to the merits. The government argues that the Court should issue a certificate of reasonable cause based on the fact that Magistrate Judge Bar-

---

**16.** In *1300 Florida Ave.*, the government moved to voluntarily dismiss the forfeiture action, and in response, the claimant moved for an award of attorney fees. *1300 Florida Ave., supra*, at *1. The court granted the motion to dismiss, and then went on to find that reasonable cause existed for the initial seizure. *1300 Florida Ave., supra*, at *1. Thus, because reasonable cause was found, and because the government had not waived its sovereign immunity, the claimant's motion for attorney fees was denied. *1300 Florida Ave., supra*, at *3. The court held that "[r]ather than waive sovereign immunity in a forfeiture action, Congress has explicitly limited governmental liability" by enacting 28 U.S.C. § 2465.

*1300 Florida Ave., supra*, at *2. The court further noted that while 28 U.S.C. § 2465 on its face applied only when "judgment" had been entered for the claimant, the principles behind 28 U.S.C. § 2465 in limiting the government's liability in forfeiture actions "would apply even more strongly in cases such as this, in which the claimants have not demonstrated that the action was so meritless that they were entitled to judgment." *1300 Florida Ave., supra*, at *2. Of course, merely because a forfeiture action has been dismissed with prejudice against the government before the claimant has had his or her trial does not mean that the claimant would have lost had the proceeding run its full course.

tunek issued a search warrant on May 7, 1992, finding probable cause at the initial evidentiary seizure stage. The government further argues that the subsequent return of the grand jury indictment on September 14, 1993, is further proof that there was probable cause for the evidentiary seizure, and thus "reasonable cause" with regard to the certificate. Mr. Katona opposes the issuance of the certificate, and argues that there are facts that rise to the level of *Leon* factors to bar the issuance of the certificate.

### 1. The Issuance of a Certificate of Reasonable Cause

■ The government's argument that a certificate of reasonable cause is appropriate here because of the issuance of a search warrant and the subsequent return of a grand jury indictment against Mr. Katona is meritless based on the facts of the case and established case law. For purposes of the issuance of the certificate, the "reasonableness" must be tested at the time of the official seizure of the firearms on November 16, 1993, because that is when the firearms were seized for the forfeiture proceedings, and so that is the relevant "seizure" for 28 U.S.C. § 2465 consideration. Here, there was the initial seizure of the firearms on May 8, 1992, pursuant to a search warrant issued on the previous day by Magistrate Judge Bartunek. This warrant was issued on the basis of Agent Kimmell's affidavit testimony that there was evidence that Mr. Katona possessed 32 NFA firearms which had been registered in violation of 26 U.S.C. § 5861(b) and § 5861(1). The May 8, 1992, seizure was therefore an evidentiary seizure based on a showing of probable cause. The May 8 seizure allowed the BATF to hold the property for evidentiary purposes. The BATF agents seized the property and held it at their Cleveland office while they continued their investigation into the suspected registration violations. Subsequently, on September 14, 1993, the grand jury returned an indictment against Mr. Katona charging him with falsifying the information on the NFA firearm transfer forms. The United States filed its complaint in forfeiture on October 28, 1993. On October 28, 1993, the United States also filed a praecipe for the issuance of warrants

of seizure and monition to the marshal to officially seize the firearms for purposes of the forfeiture action. On November 16, 1993, the marshal seized the firearms from the BATF office and thus "arrested" the firearms for the trial pursuant to the "warrants for seizure and monition."

It is the November 16, 1993, seizure which is the one to be tested for reasonableness because it was the one that was the seizure for forfeiture. In *Parcels of Real Property*, as in the instant case, there was an evidentiary seizure pursuant to a search warrant, followed by the filing of the complaint in forfeiture and then the issuance of a warrant and monition. In deciding whether to issue a certificate of reasonable cause, the court there looked not to the initial seizure pursuant to a search warrant, but to the subsequent seizure pursuant to the warrant and monition. 795 F.Supp. at 1233. As Judge Woodlock noted in his footnote there, a "simple search warrant" authorizes only seizure for evidentiary purposes; a "warrant and monition for seizure, on the other hand, authorizes seizure for the ultimate purpose of forfeiture." 795 F.Supp. at 1233 n. 5. Similarly, here the Court does not look to the May 8, 1992, seizure because that was a simple search warrant which merely gave the BATF agents the right to seize and hold the firearms for evidentiary purposes. Rather, the Court looks to the November 16, 1993, seizure because it was the one for forfeiture which was done by the marshal pursuant to the warrants for seizure and monition, issued by the clerk after the United States filed its complaint. A certificate of reasonable cause will therefore be issued if the November 16, 1993, seizure was based on probable cause.

■ The "issuance of a warrant and monition for seizure is generally enough, standing alone, for a court later to certify reasonable cause." *Parcels of Real Property*, 795 F.Supp. at 1233. There, the court explained that the issuance of a warrant for seizure and monition is enough because if such a warrant has been issued, probable cause for forfeiture has been determined, and the officials who seize the property must be able to rely on that authorization to protect them later from liability to an innocent owner. 795 F.Supp.

at 1233. There, the court issued the certificate because of a valid warrant at the "warrant and monition" stage and because no circumstances had come to light to undermine the reasonable faith in the probable cause in the interim between the warrant and monition stage and the seizure. 795 F.Supp. at 1233. Here, too, there was a warrant for seizure and monition of the defendant 33 firearms issued on October 28, 1993, and executed on November 16, 1993. In absence of any facts undermining a reasonable belief in the existence of probable cause, the issuance of the warrant for the arrest of the 33 firearms would be enough to issue a certificate of reasonable cause. While the grand jury's indictment of Mr. Katona on September 14, 1993, is evidence of probable cause, see *Friedman v. United States*, 927 F.2d 259, 262 (6th Cir.1991) (citation omitted), facts had come to light by November 16, 1993, the time of the seizure for forfeiture, that indicate that probable cause did not exist on November 16, 1993. These facts bar the issuance of the certificate. *See Parcels of Real Property*, 795 F.Supp. at 1233; *see also Leon*, 468 U.S. at 926, 104 S.Ct. at 3422.

### 2. The Existence of *Leon* Factors

■ The Court finds that while there may have been probable cause for the May 8, 1992, evidentiary seizure, there were facts that cast doubt on the reasonableness of a belief in the existence of probable cause by November 16, 1993, the seizure for forfeiture. Mr. Jeffries has testified that he provided the United States Attorney's office with several otherwise blank NFA transfer forms with Chief Beran's signature on them. This was to show the government that Chief Beran had, in fact, signed a stack of forms for Mr. Katona to use at his convenience. Mr. Jeffries also testified that he gave the government copies of all the results of Mr. Katona's fingerprint and forensic examiner. Mr. Katona's expert, Mr. Whitcomb submitted his results on April 19, 1993. He concluded that ⅓ of the forms could have been signed by Chief Beran. Mr. Whitcomb further reported that he found nothing upon which to base a definitive conclusion with regards to a comparison with Mr. Katona's signature. The United States Attorney's office had a copy of these results before it filed the complaint in this forfeiture action. The government's own handwriting expert, Mr. Johnson, submitted his report to the government on August 17, 1993. In it, he concluded, exactly as Mr. Whitcomb had, that Chief Beran could not be eliminated as the author of ⅓ of the documents. As to the other ⅔, Mr. Johnson could not make an association between Mr. Katona's handwriting samples and the "Joe Beran" signatures on the NFA transfer forms. Both of the experts also ruled out as author of the "Joe Beran" signatures Kimberly Katona, Mr. Katona, Jr., and Lisa Russell, Chief Beran's secretary. Mr. Johnson was only able to state that there were similarities between the handwritten dates next to the "Louis E. Katona" signatures and the "Joe Beran" signatures, but because Mr. Johnson noted that Mr. Katona might not have been writing in his natural handwriting, Mr. Johnson was unable to make a further association. Prior to October and November of 1993, Mr. Jeffries also provided the government with information pertaining to the disagreement between the Chief and Mr. Katona over the badge.

On September 14, 1993, the grand jury returned an indictment against Mr. Katona charging him with making false representations on the NFA transfer forms. The United States Attorney argued before the grand jury that even if the Chief had signed a stack of the forms for Mr. Katona, Mr. Katona would still have broken the law because he had not signed them in front of the Chief, as the form requires. This part of the indictment, however, was later removed from the indictment by Judge Battisti, who held as Judge White later did, that signing the forms outside the presence of the Chief was not a violation of the law. On October 28, 1993, based on evidence that ⅓ of the forms could have been signed by the Chief and that the remaining ⅔ could not be associated with the examples of Mr. Katona's signature, the United States Attorney's office filed its complaint in this case for the forfeiture of the firearms charging Mr. Katona with knowingly making the false representation that he had received the Chief's signature when in fact he had not.

On October 28, 1993, and on November 16, 1993, the government did not have probable cause to believe that Mr. Katona had forged the Chief's name on those forms. There was no longer any evidence linking Mr. Katona to the forgery of the "Joe Beran" signatures rising above mere suspicion, which is simply not enough to show probable cause. *See United States v. $67,220.00 in U.S. Currency,* 957 F.2d 280, 284 (1992) (citations omitted) (definition of probable cause is a "reasonable ground for belief of guilt, supported by less than *prima facie* proof but more than mere suspicion"). The government's own expert had no proof that could tie Mr. Katona's handwriting to the "Joe Beran" signatures and in fact had not been able to rule out ⅛ of the forms as being signed by the Chief himself. This information was given to the government on August 17, 1993, well before the filing of the complaint and the subsequent seizure of the firearms for forfeiture on November 16, 1993. While the government may have had probable cause to suspect Mr. Katona had forged the signatures on May 8, 1992, between then and November 16, 1993, "facts came to light that would have undermined a reasonable faith in the adequacy of probable cause." These additional facts act as *Leon* factors to bar the issuance of a certificate of reasonable cause. *See Parcels of Real Property,* 795 F.Supp. at 1233.

In *Stacey v. Emery,* the United States Supreme Court set down this test for probable cause: "If the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offence has been committed, it is sufficient." 97 U.S. (7 Otto) 642, 645, 24 L.Ed. 1035 (1878). Here, the Court finds that a prudent person would not reasonably believe that Mr. Katona had forged the "Joe Beran" signatures because the handwriting experts were unable to make any association between Mr. Katona's handwriting and the signatures and because the Chief appeared, in fact, to have signed ⅛ of them even though he stated that he did not. In this case, a prudent person might conclude that the Chief signed ⅛ of the forms, as the experts believed, and authorized the rest, as was contended by Mr. Katona. In any case, the inconclusiveness of the government's expert reports left the government with no evidence to establish probable cause that Mr. Katona committed a crime. The return of the grand jury indictment against Mr. Katona is not enough to establish probable cause in light of the facts undermining a reasonable belief in probable cause. Thus, the Court holds that there was no probable cause for the November 16, 1993, seizure because facts had come to light between May 8, 1992, and October 28, 1993, which undermined any reasonable belief in the probable cause for the seizure. While the government may have had probable cause to suspect Mr. Katona had forged the signatures as of May 8, 1992, between then and November 16, 1993, the government learned additional facts that undermined a reasonable faith in the adequacy of probable cause and bar the issuance of a certificate of reasonable cause.

## V. Claimant's Application for Attorney Fees

Mr. Katona has filed an application for an award of attorney fees (Docket No. 36). The application presents numerous issues. The threshold issue is whether Mr. Katona is entitled to any award of attorney fees. The government takes the position that there is no statutory authority for such an award. Secondarily, the government disputes Mr. Katona's claim for an allowance of attorney fees for the work associated with the criminal case and argues that the recovery should be limited in any event to the work associated with the forfeiture action.

The Court has discovered in other attorney fee disputes that the Court's ADR program—in particular, Mediation pursuant to Local Rule 7:3—has been a very successful way of resolving attorney fee disputes, even in those cases where the parties reserve the right to file an appeal to the underlying substantive decision of the Court. Consequently, as an alternative to a judicial resolution of the attorney fee dispute, the Court hereby orders the parties to engage in Mediation in an attempt to resolve the attorney fee dispute.

To assist the parties in the Mediation process, the Court makes the following preliminary, but not final, determinations:

1. The Court is of the view that Mr. Katona is entitled to attorney fees under the EAJA upon the determination that the position of the government in commencing the forfeiture action on October 28, 1993, was not substantially justified.[17] The discussion of the denial of the certificate of reasonable cause based on the Court's finding of no probable cause for the November 16, 1993, seizure tracks the same reasoning that the Court would use in finding the government's position in commencing the forfeiture action on October 28, 1993, not substantially justified for EAJA purposes. *See* discussion at IV.B.2., *supra.*

2. The Court is of the view that Mr. Katona is not entitled to an award of attorney fees or costs for the work of his attorney associated with the defense of the criminal case. *Compare Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 684, 94 S.Ct. 2080, 2092, 40 L.Ed.2d 452 (1974); *United States v. Premises and Real Property at 614 Portland Ave.,* 670 F.Supp. 475, 479 (W.D.N.Y.1987), *aff'd,* 846 F.2d 166 (2d Cir. 1988).

3. The Court is of the view that the experience of Mr. Katona's attorney justifies an award of a fee higher than $75.00 an hour.[18]

**17.** Mr. Katona has maintained another argument that although this action was brought under Title 26, certain Title 18 provisions apply here as well. Mr. Katona argues that pursuant to the Firearm Owners Protection Act ("FOPA"), both Title 26 firearm actions and Title 18 firearm actions provide for the statutory award of attorney fees for successful claimants. Mr. Katona argues that the FOPA 120–day statute of limitations for bringing a forfeiture proceeding, 18 U.S.C. § 924(d)(1), barred the filing of this action because the complaint was filed more than 120 days after the May 8, 1992, seizure. Mr. Katona further argues that even though this action was barred by the statute of limitations, he is entitled to attorney fees under 18 U.S.C. § 924(d)(2)(A), which allows the award of attorney fees to the prevailing party in a proceeding for the return of "firearms."

A plain reading of 18 U.S.C. §§ 924(d)(1) and 924(d)(2)(A), indicates that the Title 18 provisions cited by Mr. Katona do not apply to this Title 26 case. Chapter 53 of Title 26 is a codification of the National Firearm Act ("NFA") of 1934 and is applicable to a narrow class of firearms such as machine guns, "sawed-off" rifles and shotguns, short barreled rifles and shotguns, silencers, and the like. 26 U.S.C. § 5845(a). Chapter 44 of Title 18, however, regulates various aspects of acquisition, disposition and commerce in non-NFA weapons, i.e., standard length shotguns, rifles, pistols and revolvers. 18 U.S.C. § 921. In 1986, Congress enacted the FOPA which, among other things, enacted the statute of limitations and attorney fee provisions codified at 18 U.S.C. §§ 924(d)(1) and 924(d)(2)(A). The statute of limitations provision clearly states it applies to proceedings for the forfeiture of "firearms," which, as defined in § 921 means non-NFA firearms. As the firearms in this case were NFA firearms, the 120–day statute of limitations for commencing a forfeiture proceeding contained in 18 U.S.C. § 924(d)(1) does not apply to this case. The attorney fee provision contained in 18 U.S.C. § 924(d)(2)(A) similarly does not apply for the same definitional reason, and because 18 U.S.C. § 924(d)(2)(A) plainly states that attorney fees will be awarded

for a proceeding for the return of firearms seized "under the provisions of this chapter," which means Chapter 44 of Title 18. *See National Rifle Association v. Bentsen,* 999 F.2d 772, 774 (4th Cir.1993) (to recover attorney fees under 18 U.S.C. § 924(d)(2)(B), a plain text reading of "under this chapter" means the seizure must have been made "under" Chapter 44). As the firearms in this case were seized under Chapter 53 of Title 26, the attorney fee provision is not appropriate here.

Although recent amendments have defined Title 26 NFA weapons and Title 18 weapons to include "machine guns," these amendments have not obliterated the significant distinctions between Title 26 firearms and Title 18 firearms as Mr. Katona contends. *See Cooper v. City of Greenwood, Miss.,* 904 F.2d 302, 305 (5th Cir. 1990) (making a distinction between types of firearms by stating that "[a] firearm, unless of the type proscribed by the National Firearm Act, 26 U.S.C. § 5801 et seq., is not inherently illegal."). *See also United States v. Ross,* 9 F.3d 1182, 1194 (7th Cir.1993) (no due process violation because of the inclusion of "machine gun" to the definition of Title 18 as well as Title 26 firearms); *id.* ("[T]he amendment to the Gun Control Act effectively rendered possession of certain guns automatic violations of both the Gun Control Act and the National Firearm Act. Yet there is nothing either inconsistent or unconstitutionally unfair about Congress' decision to do so. And, faced with two equally applicable penal statutes, there is nothing wrong with the government's decision to prosecute under one and not the other, so long as it does not discriminate against any class of defendants."), *cert. granted and judgment vacated on other grounds,* —— U.S. ——, 114 S.Ct. 2129, 128 L.Ed.2d 860 (1994). Thus, even if the Court's preliminary finding that Mr. Katona is entitled to attorney fees under the EAJA is later changed, the Court finds that Mr. Katona is not entitled to attorney fees under 18 U.S.C. § 924(d)(2)(A).

**18.** Under the EAJA, 28 U.S.C. § 2412(d)(2)(A), an award of attorney fees in this situation where

The Court notes that Mr. Katona's attorney has requested $125.00 an hour.

4. The recitation contained in Mr. Katona's application for attorney fees setting forth the hours worked on behalf of Mr. Katona in both the forfeiture action and in the criminal action does not contain sufficient information to assist the Court in determining whether the hours charged relate to the forfeiture action or the criminal action or both. The same difficulty applies to the application for an award of costs. To assist in the Mediation process, the Court requests that the attorney for Mr. Katona file an amended application with an indication of whether the hours and costs claimed relate to the criminal case of the forfeiture action or both.[19] The amended application should be filed and a copy served on government's counsel by August 15, 1995.

The ADR administrator is directed to schedule the Mediation to begin not before August 21, 1995 and to be completed by September 15, 1995.

## VI. Conclusion

For the reasons set forth above, the motion of Plaintiff, the United States of America, (Docket No. 18) for the issuance of a certificate of reasonable cause is hereby DENIED. The Court further orders the parties to engage in Mediation in an attempt to resolve the dispute about Mr. Katona's motion for the award of attorney fees and costs (Docket No. 36). JUDGMENT ACCORDINGLY.

IT IS SO ORDERED.

---

the position of the government was not substantially justified shall not be in excess of $75.00 per hour unless the court determines that "an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee."

**19.** To the extent that Mr. Katona's attorney indicates that the hours apply to both, the Court directs him to add an explanation indicating specifically how the work relates to both cases.